IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

OMOA WIRELESS, S. DER. L.                    )
                                             )
        Plaintiff and                        )
        Counterclaim-Defendant,              )
v.                                           )
                                             )
UNITED STATES OF AMERICA                     )
                                             )
        Defendant, Counterclaim              )
        Plaintiff, and                       )
        Third-party Plaintiff                )        1:06CV148
                                             )
v.                                           )
                                             )
GARY R. BOGGS;                               )
KATHLEEN PRIMAVERA BOGGS;                    )
UNKNOWN TRUSTEE, individually                )
and as trustee of NORTHSTAR                  )
PROPERTIES; JOHN MICHAEL CRIM                )
and CECIL H. DAWSON, individually            )
and as co-trustees of CORREDORES             )
CENTROAMERICANOS HOLDINGS,                   )
                                             )
        Third-Party Defendants               )

## MEMORANDUM OPINION AND ORDER

Presently before the court is the United States' Motion for
Summary Judgment (Doc. 139), a Motion for Summary Judgment by
Kathleen Primavera ("Ms. Primavera") (Doc. 134), a Joint Motion
for Entry of Consent Judgment by the United States and OMOA
Wireless S. De R. L. ("OMOA") (Doc. 129), and a Motion to Dismiss
Counterclaim by OMOA (Doc. 139).[1]  All the motions are opposed,

---

[1] Corredores, a party to this case, filed a stipulation on
May 14, 2009, waiving any interest it may have held in the
properties at issue.  (Doc. 90.)  That stipulation was not

-1-

and the parties' arguments have been fully briefed. A motions hearing was held before this court on June 16, 2010. For the reasons that follow, the United States' motion for summary judgement will be granted, Ms. Primavera's motion will be denied, the joint motion for consent judgment will be granted, and OMOA's motion to dismiss Ms. Primavera's counterclaim will be dismissed as moot.

I. Background

A. Properties at Issue

The four parcels of land at issue in this case are as follows: 1) Fink Street property; 2) Tract 1 and Tract 2 property; 3) Faith Road property; and 4) Wood Duck Cove property. In 1988, Gary Boggs' former wife, Margaret Boggs, conveyed her interest in the Fink Street property to Mr. Boggs as part of a settlement agreement. (U.S.' Mem. Support Mot. Summ. J. (Doc. 141) Ex. 118.) In May of 2000, Mr. Boggs' parents and his aunt and uncle conveyed the Tract 1 and Tract 2 property to Mr. Boggs and his wife at the time, Kathleen Primavera. (Id. Ex. 6.) In 1991, Mr. Boggs and Ms. Primavera acquired the Faith Road property. (Eggleston Aff. (Doc. 136) Ex. 3.) They acquired the Wood Duck Cove property in 1997. (Id. Ex. 8.)

_____

referred to this court until recently when, at the settlement conference, Corredores again noted that it has relinquished any interest by the stipulation. That stipulation has been adopted by this court.

In September of 2000, Mr. Boggs and Ms. Primavera bought the Corredores Centroamericanos Holdings trust ("Corredores") from the Commonwealth Trust Company ("Commonwealth"). (U.S.' Mem. Ex. 3; Boggs Dep. (Doc. 140 Ex. 114) at 32-33; Primavera Aff. (Doc. 135) ¶¶ 3, 5.) The promoters of Commonwealth have been convicted of charges related to tax fraud and are currently serving sentences in federal prison. (Br. Support Mot. Summ. J. by Primavera (Doc. 137) Exs. 2-3.) Ms. Primavera stated that she was skeptical of Commonwealth, did not fully understand what they did, and had no intent to hinder, delay, or defraud the United States from collecting taxes. (Primavera Aff. ¶ 5.) Despite her doubts, Ms. Primavera agreed to transfer all their properties to Corredores as an "estate planning device" for the benefit of their children. (Id.) Neither Ms. Primavera nor Mr. Boggs received consideration for the transfer, despite the fact that the deeds recited that valuable consideration was given. (Id. ¶ 6; Boggs' Resp. to Interrogs. (Doc. 141 Ex. 36) at 2; U.S.' Mem. Ex. 1 at 2; Eggleston Aff. (Doc. 136) Ex. 2 at 1.) Ms. Primavera stated in her affidavit that the transfer of the Wood Duck Cove property was a mistake that she did not realize at the time of the transfer. (Primavera Aff. ¶ 6.) She received a deed conveying Wood Duck Cove back to her in 2005, which was recorded in 2006. (Id. ¶ 16.) Soon after the transfers to Corredores, Ms. Primavera became concerned with their involvement in the

Commonwealth scheme, and she initiated a divorce from Mr. Boggs when he refused to withdraw from the scheme. (Id. ¶ 9.) A decree of divorce was filed on October 30, 2003. (Primavera Aff. Ex. 2.)

On November 1, 2003, Northstar Properties was created as a "business trust organization." (U.S.' Mem. Ex. 8 at 1; Boggs Dep. at 94-95.) Mr. Boggs stated that the "sole purpose" of creating Northstar was to transfer the properties after the divorce. (Boggs Dep. at 95.) All the parcels of land except the Wood Duck Cove property were transferred from Corredores to Northstar. (Id. at 94-95.) Northstar conveyed the properties to OMOA, a Honduran corporation, in 2004. (U.S.' Mem. Exs. 119-20.)

Mr. Boggs continued to live at the Fink Street property after the conveyances to Corredores, Northstar, and OMOA. (Boggs Dep. at 9-10, 47-48.) Mr. Boggs stated that he moved out of the house at some point after the transfer to OMOA (id. at 10), but he still stayed there "from time to time" and maintained an office there (id. at 172). Although he stated it was a mistake, he paid property insurance for the Fink Street property from 2005 to 2006. (Id. at 180.) Mr. Boggs also obtained and paid for a permit to connect a residence on the Fink Street property to the town's water and sewer service. (Driver Decl. (Doc. 141).)

Regarding the Faith Road property, Mr. Boggs developed and sold a portion of the property after the conveyance to

Corredores. (Boggs Dep. at 58.) Mr. Boggs personally built a small cul-de-sac on the property and created storm water drainage. (Id. at 58-59.) Mr. Boggs' company, Central A Brokers, paid $5,982 in fees to the Town of Faith for that development. (Id. at 177; U.S.' Mem. Ex. 29.) Another of Mr. Boggs' companies, Trinity Marketing and Sales, paid for a professional survey of the property, cleared and graded a road and utility area, and secured bids for the installation of water and sewer to the property. (Boggs Dep. at 167-70; U.S.' Mem. Ex. 25.) Mr. Boggs also personally negotiated a contract with a heavy construction company and paid them a total of $80,274 for their work on the property. (Boggs Dep. at 175-77; U.S.' Mem. Exs. 27-28.) In total, Mr. Boggs stated that he paid approximately $90,000 of his own money in developing the property, and he did not receive any reimbursement from OMOA. (Boggs Dep. at 170.)

As a result of examinations of Mr. Boggs' income tax returns for 1998 and 1999, the Internal Revenue Service ("IRS") determined in 2003 that Mr. Boggs was liable for unpaid federal taxes in excess of one million dollars. (See Little Decl. (Doc. 140 Ex. 3) ¶¶ 2-3.) In 2004, the United States ("U.S." or "the government") declared Ms. Primavera an innocent spouse in regard to the tax liability. (Primavera Aff. Ex. 4.) In 2005, the U.S. filed federal tax liens on all four parcels of land against OMOA

as a nominee/transferee/alter ego of Mr. Boggs.  (Compl. (Doc. 2) at 11-20.)

B. **Procedural History**

In 2006, OMOA filed this action against the U.S. requesting that the court declare it to be the owner of the properties free and clear of any claim by the U.S.  (Compl. (Doc. 2) at 2.)  The U.S. subsequently filed a counterclaim to foreclose on its federal tax liens and also filed a third-party complaint that named Ms. Primavera and Mr. Boggs as defendants.  (U.S.' Am. Answer, Countercl. & Third-party Compl. (Doc. 12).)  Ms. Primavera then filed counterclaims against OMOA and the U.S. and a cross-claim against Mr. Boggs requesting that the court declare Ms. Primavera to be the owner of an undivided one-half interest of the Faith Road property and the Tract 1 and Tract 2 property and the sole owner of the Wood Duck Cove property.  (Answer to Third-party Compl., Cross-cl. & Defenses of Primavera (Doc. 37).) She asserted that the liens do not apply to her ownership rights and that she should receive her interest in the property free and clear of the claims by the U.S.  (Id. at 11.)

In April of 2010, OMOA and the U.S. entered a joint motion for entry of consent judgment in which OMOA agreed to dismiss its complaint against the U.S. and to consent to the relief sought by the U.S. in its counterclaim.  (Joint Mot. Entry Consent J. (Doc. 129).)  In the same month, the U.S. filed a motion for summary

judgment seeking a judgment declaring that the U.S. is entitled
to foreclose on all the properties in order to discharge Mr.
Boggs' tax liability and that Ms. Primavera is only entitled to a
one-half undivided interest in the Wood Duck Cove Property.
(U.S.' Mem. at 18-19.)  Ms. Primavera also filed a motion for
summary judgment in April of 2010 seeking a judgment declaring
that she has a one-half undivided interest in the Tract 1 and
Tract 2 property and the Faith Street property and full interest
in the Wood Duck Cove property.  (Br. by Primavera (Doc. 137) at
11.)  OMOA filed a motion to dismiss Ms. Primavera's counterclaim
in April of 2010.  (OMOA's Mot. Dismiss (Doc. 139).)

## II. Analysis

### A. The United States' Motion for Summary Judgment

On April 19, 2010, the U.S. moved for summary judgment on
its counterclaim and third-party complaint.  (U.S.' Mot. Summ. J.
(Doc. 140).)  Summary judgment is appropriate under Rule 56(c)(2)
of the Federal Rules of Civil Procedure "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled judgment as a matter of law."  The
judge's role is not to "weigh the evidence and determine the
truth of the matter" but rather to determine whether there is a
genuine issue of material fact such that a reasonable jury could
find in favor of the non-moving party.  Anderson v. Liberty

Lobby, Inc. 477 U.S. 242, 249-50 (1986). The "mere existence of some alleged factual dispute" does not mean that the factual dispute is genuine. Id. at 247-48. A factual dispute is genuine if a jury could reasonably find for the non-moving party. Id. at 252-55. Thus, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

### 1. Mr. Boggs' Tax Liability

The U.S. alleges that, according to assessments made by a delegate of the Secretary of the Treasury, Mr. Boggs is indebted to the U.S. "in the amount of $1,121,272 as of March 6, 2006, plus statutory additions that will accrue according to law." (U.S.' Second Am. Answer, Countercl. & Third-party Compl. (Doc. 47) ¶ 59.) The U.S. contends that the court should grant summary judgment against Mr. Boggs for this tax liability since an assessment is entitled to a presumption of correctness, and Mr. Boggs bears the burden of proof to establish that the assessment is incorrect. (U.S.' Mem. Support Mot. Summ. J. (Doc. 141) at 11-12.)

"It is well established that as a general matter, the Commissioner's determination of deficiency is presumed correct and the taxpayer bears 'the burden of proving it wrong.'" Cebollero v. C.I.R., 967 F.2d 986, 990 (4th Cir. 1992) (citing

<u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933)). Therefore, the government has established a prima facie case of tax liability when it presents certified copies of the certificates of the assessment. <u>U.S. v. Pomponio</u>, 635 F.2d 293, 296 (4th Cir. 1980). In order to rebut the presumption of correctness, "the taxpayer must prove by a preponderance of the evidence that the Government's assessment is erroneous," but need not prove the exact amount he or she does owe. <u>Higginbotham v. U.S.</u>, 556 F.2d 1173, 1175 (4th Cir. 1977); <u>see also</u> <u>Cebollero</u>, 967 F.2d at 990 (holding that the taxpayer overcomes the presumption of correctness if he can prove that the Commissioner's determination is "'arbitrary and excessive,' regardless of whether he can prove the amount he actually owes").

In the present case, the U.S. has presented certified copies of the certificates of the assessments (U.S.' Mot. Summ. J. (Doc. 140) Exs. 4-6) and thereby established a prima facie case of tax liability against Mr. Boggs. <u>See</u> <u>Pomponio</u>, 635 F.2d at 296. The assessments are presumed to be correct. <u>Id.</u> Therefore, Mr. Boggs bears the burden of presenting evidence establishing that the tax liability in the assessments is incorrect. <u>See</u> <u>Cebollero</u>, 967 F.2d at 990. In the motions hearing before this court on June 16, 2010, Mr. Boggs indicated that the evidence he would present at trial is the proposed amended returns that the IRS rejected and the testimony of the accountant who prepared the

returns.[2]  Without any supporting documentation or explanation,

---

[2] Mr. Boggs was late in filing a response to the United
States' Motion for Summary Judgment and sought permission to file
the late response.  (See Boggs' Mot. Extension of Time (Doc.
153); Boggs' Mot. Recons. (Doc. 157).)  Those motions were denied
by the Magistrate Judge, and Mr. Boggs objected. (Boggs' Object.
(Doc. 163).)  This court has considered Mr. Boggs' response to
the United States' Motion for Summary Judgment (Boggs' Mot.
Recons. Ex. 3) as well as Mr. Boggs' proffer at the motions
hearing before this court on June 16, 2010.  See Custer v. Pan
American Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993)
("Although the failure of a party to respond to a summary
judgment motion may leave uncontroverted those facts established
by the motion, the moving party must still show that the
uncontroverted facts entitle the party to 'a judgment as a matter
of law.'").  The determination of whether the U.S. is entitled to
judgment is complex.  This court found it necessary to consider
Mr. Boggs' responses to summary judgment to aid the court in its
decision.  Nevertheless, because this court finds Mr. Boggs'
response insufficient to preclude summary judgment, this court
further finds it unnecessary to re-open the pleadings and permit
the U.S. or Ms. Primavera to reply.
    In addition to the matters addressed in the body of this
opinion, there are two other reasons why Mr. Boggs' tender of
facts is insufficient to preclude summary judgment.  First, in
his brief, Mr. Boggs contends that the government's responses in
discovery are insufficient to support the deficiency calculation.
(Boggs' Mot. Recons. Ex. 3 at 4-6.)  However, Mr. Boggs has not
met his burden of going forward with the evidence, so the burden
of proof has not at this point shifted back to the government.
See Pomponio, 635 F.2d at 297 n. 4; see also Psaty v. United
States, 442 F.2d 1154, 1160 (3d Cir. 1971) (noting that the
presumption in favor of the assessments is based on the policy
that "the taxpayer has more readily available to him the correct
facts and figures").
    Second, Mr. Boggs refused to provide certain bank account
information during discovery pursuant to his Fifth Amendment
privilege (Mot. Compel Resp. Disc. (Doc. 123); Boggs' Resp. Opp'n
Mot. Compel (Doc. 128)), which the Magistrate Judge upheld in an
order on March 4, 2010.  A taxpayer's bank account information is
relevant to a tax calculation.  See Harris v. Commissioner of
Internal Revenue, 174 F.2d 70, 73 (4th Cir. 1949) (discussing the
source of a taxpayer's bank deposits in the context of
determining a tax calculation); United States v. Kim, 884 F.2d
189, 192 (5th Cir. 1989) (stating that a rational jury could find
that consistently underreporting income and "maintaining numerous
bank accounts" demonstrates intent to violate duty to pay taxes

this evidence amounts to an unsubstantiated claim that does not provide actual proof of the assessments' error.  See, e.g., Davis v. C.I.R., 674 F.2d 553, 553-54 (6th Cir. 1982) (holding that a taxpayer's sworn tax return is not sufficient evidence to substantiate a claim that the government's assessment is erroneous); Mills v. C.I.R., 399 F.2d 744, 749 (4th Cir. 1968) (holding that the government's assessment is not "overcome by the vague and indefinite testimony of the taxpayer").  Mr. Boggs has not forecast any evidence of records or testimony that would support a finding of fact that the government's assessments are erroneous.  Therefore, because Mr. Boggs has not forecast evidence that could rebut the presumption in favor of the assessments, this court will grant the government's motion for summary judgment as to Mr. Boggs' tax liability.

### 2. The OMOA Properties

The U.S. argues that since OMOA has consented to the foreclosure of the nominee liens against the properties, the court should order foreclosure and sale of the properties and apply the proceeds to Mr. Boggs' tax liability.  (U.S.' Mem. Support Mot. Summ. J. (Doc. 141) at 11.)  With regard to Ms.

---

or to mislead the IRS).  Mr. Boggs' refusal to disclose information that is relevant to a tax calculation provides further support for a finding that Mr. Boggs is not able to present anything other than an unsubstantiated claim of error as to the assessment.  That evidence is insufficient to rebut the presumption in favor of the assessments and thereby withstand summary judgment.

Primavera's interest in the OMOA properties, the U.S. contends that since it is proceeding under the nominee or alter ego theory and not the fraudulent conveyance theory, Ms. Primavera is not entitled to a one-half interest in the Faith Road property or the Tract 1 and Tract 2 property. (Id. at 14.) Ms. Primavera argues that there are genuine issues of material fact as to her interests in the properties. (Primavera's Br. Opp'n Mot. Summ. J. by U.S. (Doc. 147) at 10-11, 13-16.) Accordingly, the issues before the court regarding the OMOA properties are (1) whether there are any genuine issues of material fact as to the status of Correodores, Northstar, and OMOA as nominees or alter egos of Mr. Boggs such that the U.S. may order foreclosure and sale of the properties, and (2) whether there are any genuine issues of material fact as to Ms. Primavera's rights to the OMOA properties.

### a. Nominee Status of Corredores, Northstar, and OMOA

The U.S. may enforce federal tax liens against property owned by a delinquent taxpayer in federal district court. 26 U.S.C. § 7403(a) (2006). Property owned by a delinquent taxpayer includes property owned by a third party that is a nominee or alter ego of the taxpayer. G.M. Leasing Corp. v. United States, 429 U.S. 338, 350-51 (1977); see also United States v. Scherping, 187 F.3d 796, 801 (8th Cir. 1999) ("The government may collect the tax debts of a taxpayer from assets of the taxpayer's nominee instrumentality, or 'alter ego.'"); Shades Ridge Holding Co.,

Inc. v. United States, 888 F.2d 725, 728 (11th Cir. 1989)

("Property of the nominee or alter ego of a taxpayer is subject

to the collection of the taxpayer's tax liability."); Lemaster v.

United States, 891 F.2d 115, 119 (6th Cir. 1989) (holding that

"proceeding against the nominee of a taxpayer for the purpose of

satisfying the taxpayer's tax obligations" is a legitimate legal

theory). The initial inquiry in any case involving a federal tax

lien is to determine what rights the taxpayer has to the property

in question under state law. See Drye v. United States, 528 U.S.

49, 58 (1999) ("We look initially to state law to determine what

rights the taxpayer has in the property the Government seeks to

reach, then to federal law to determine whether the taxpayer's

state-delineated rights qualify as 'property' or 'rights to

property' within the compass of the federal tax lien

legislation."); Aquilino v. U.S., 363 U.S. 509, 512-13 (1960)

("The threshold question . . . in all cases where the Federal

Government asserts its tax lien, is whether and to what extent

the taxpayer had 'property' or 'rights to property' to which the

tax lien could attach. In answering that question, both federal

and state courts must look to state law . . . ."). Thus, in

order to determine whether a third party is a nominee or alter

ego of the taxpayer, the court must determine whether the

taxpayer has a legal right in relation to the property under

state law. See Scherping, 187 F.3d at 802 ("Generally, federal

courts will look to state law to determine whether an entity is

-13-

an alter ego of a taxpayer."); U.S. v. Thornton, 859 F.2d 151, 1988 WL 97278, at *2 (4th Cir. 1988) (unpublished table opinion)[3] (holding that in a tax lien case proceeding under a nominee theory, "the government has to prove that [the taxpayer] had . . . a property right under [state] law").

In Thornton, the Fourth Circuit reversed a district court for applying the state law with respect to collection of real estate taxes instead of the law of resulting trusts. Thornton, 1988 WL 97278, at *3. Both the Sixth Circuit and the Tenth Circuit have emphasized that the district court must initially determine the taxpayer's property rights under state law. Spotts v. United States, 429 F.3d 248, 252-54 (6th Cir. 2005); Holman v. United States, 505 F.3d 1060, 1067-68 (10th Cir. 2007).

Ms. Primavera suggests that, as to Mr. Boggs' interest, the appropriate North Carolina law to apply in this case is that of resulting trusts or constructive trusts.[4] (Reply to Opp'n by U.S. to Primavera's Mot. Summ. J. (Doc. 156) at 5-6.) "A

---

[3] This court has been unable to find a published opinion from the Fourth Circuit applying the law of federal tax liens to property held by a nominee or alter ego of the delinquent taxpayer.

[4] Ms. Primavera seems to argue that the law of resulting and constructive trusts leads to the conclusion that her transfer of the property to Corredores was a legal nullity from the outset, which the court should set aside as if it never happened, thus allowing her ownership rights to remain intact. (See Reply to Opp'n by U.S. to Primavera's Mot. Summ. J. (Doc. 156) at 5-7.) This section only discusses Mr. Boggs' legal position in relation to the properties at issue and will leave a discussion of Ms. Primavera's ownership rights until the next section.

resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein and the beneficial interest is not otherwise effectively disposed of." Strange v. Sink, 27 N.C.App. 113, 116, 218 S.E.2d 196, 198 (1975). One circumstance that creates a resulting trust under North Carolina law is known as a purchase money resulting trust and occurs when one party provides the consideration for a purchase of property, but title is taken in another party's name. Taylor v. Gillespie, 66 N.C.App. 302, 306, 311 S.E.2d 362, 365 (1984). In this circumstance, the person who paid the consideration retains equitable title to the property even though another has legal title. Bowen v. Darden, 241 N.C. 11, 13, 84 S.E.2d 289, 292 (1954). In the present case, no consideration was provided for the transfer of the properties to Corredores (Primavera Aff. (Doc. 135) ¶ 6; Boggs' Resp. to Interrogs. (Doc. 141 Ex. 36) at 2), and Ms. Primavera and Mr. Boggs directly conveyed the property to Corredores. Therefore, a purchase money resulting trust is not applicable.

However, the general principal of a resulting trust might still apply if the circumstances create an inference that the parties intended for legal title to be transferred to Corredores while beneficial title remained with Mr. Boggs. See Strange, 27 N.C.App. at 116, 218 S.E.2d at 198. The fact that Mr. Boggs

-15-

continued to reside on one of the properties after the transfer

and improved another of the properties without reimbursement

might give rise to an inference that the parties intended a

resulting trust.  However, any implicit inference from these

circumstances is undermined by the fact that the document

creating Corredores explicitly states that the "Trustees" of

Corredores, who are designated as John Crim and Cecil Dawson, are

to hold the property for the benefit of the "Certificate

holders," who are not specified in the document.  (U.S.' Mem.

Support Mot. Summ. J. (Doc. 141) Ex. 3 at 6.)  Mr. Boggs'

transfer of the property to an organization created explicitly

for the benefit of other parties undermines an equitable

inference that the parties intended for Mr. Boggs to retain

beneficial title for himself.  While the law of resulting trusts

is potentially applicable to the government's claim, this court

determines that, as discussed below, the law of fraudulent

conveyances is more appropriately applied here.[5]

---

[5] In <u>Thornton</u>, the Fourth Circuit determined that the law of
resulting trusts was the proper body of law in Maryland to
determine the ownership of the land in question because it
controlled "circumstances in which one person provides
consideration to purchase property that is placed in the legal
ownership of another."  <u>Thornton</u>, 1988 WL 97278, at *3.  As
discussed above, no consideration was provided in this case.
However, general principles of equity like those in the law of
resulting trusts may still allow a court to determine the
ownership of land in a case like this one.  For instance, in
<u>United States v. Haddock</u>, 144 F.Supp. 720 (E.D.N.C. 1956), the
court relied on general principles of equity to determine that
the defendant's transfer of land was an attempt to defraud the
U.S. from collecting taxes and that, as a result, the defendant

The law of constructive trusts, suggested by Ms. Primavera, is also not the most appropriate state law in this case. A constructive trust arises when a person "obtains legal title to property in violation of a duty" he or she owes to another. Miller v. Rose, 138 N.C.App. 582, 591, 532 S.E.2d 228, 234 (2000) (internal quotation marks and citations omitted). In such a case, equitable title is actually retained by the wronged party. Bowen v. Darden, 241 N.C. 11, 13-14, 84 S.E.2d 289, 292 (1954). In the present case, neither Mr. Boggs nor Ms. Primavera have alleged any wrongdoing on the part of Corredores. Although Ms. Primavera has alleged that she did not fully understand the nature of the transfers to Corredores at the time they were made, her misunderstanding was based on Mr. Boggs' representations, not Corredores'. (Br. Support Mot. Summ. J. by Primavera (Doc. 137) at 3-5.) Therefore, the remedy of constructive trusts is not applicable to this case.

Rather than the law of resulting or constructive trusts, the North Carolina law that this court will apply to determine the

---

was the equitable owner of the land for the purpose of the U.S. attaching its lien. Id. at 725. This court does not apply equitable principles in this case because, as discussed below, North Carolina has codified the law of fraudulent conveyances in statutes, and that law is directly applicable to the situation at bar. Furthermore, the U.S. has pled the elements of a fraudulent conveyance in North Carolina, see infra note 6, but has not pled a theory based upon resulting trusts (see U.S.' Second Am. Answer, Countercl. & Third-party Compl (Doc. 47)). Nevertheless, these equitable theories support the same result reached by this court. See infra note 10.

ownership status of the properties is the law of fraudulent transfers as to creditors, which is codified in N.C. Gen. Stat. § 39-23.4 (2010).[6] See Embree Constr. Group, Inc. v. Rafcor, Inc., 330 N.C. 487, 491, 411 S.E.2d 916, 920 (1992) ("The court's equitable intervention is obviated when an adequate remedy at law is available to the plaintiff . . . .") Section 39-23.4(a) states that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith intent to hinder, delay, or defraud any creditor of the debtor." In order to determine the debtor's intent, a court may consider the following factors:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

---

[6] The government has sufficiently pled the elements of § 39-23.4 in Count II as an alternative to the lien theory in Count I. (U.S.' Second Am. Answer, Countercl. & Third-party Compl. (Doc. 47) ¶ 39 (stating that the transfer was "made with the intent to hinder, delay, and/or defraud the United States from collecting Taxpayer's income tax liabilities or in the alternative, were conveyed without fair consideration at a time when Taxpayer was insolvent, or became insolvent as a result of the conveyances").)

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor;

(12) The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and

(13) The debtor transferred the assets in the course of legitimate estate or tax planning.

§ 39-23.4(b). Regarding the first factor (a transfer to an insider), the comments for the section cite to a case that states that "shifting of assets by the debtor to a corporation wholly controlled by him is . . . [a] badge of fraud." In re Kaiser, 722 F.2d 1574, 1583 (2d Cir. 1983). In the present case, no party disputes that Mr. Boggs created Corredores with himself and his wife as the only "managing directors," which gave them power to control the properties in the trust. (Boggs Dep. (Doc. 140 Ex. 114) at 43-44, 109; Primavera Dep. (Doc. 141 Ex. 115) at 82-

83; U.S.' Mem. Support Mot. Summ. J. (Doc. 141) Ex. 4.) This kind of insider transfer indicates fraudulent intent under § 39-23.4(b)(1).

The undisputed facts in this case also indicate fraudulent intent under the second factor – that "the debtor retained possession or control of the property transferred after the transfer." § 39-23.4(b)(2). Mr. Boggs stated in his deposition that he continued to live at the Fink Street property after the conveyances and continued to develop the Faith Road property extensively with his own money without being reimbursed. <u>See</u> <u>supra</u> Part I.A.

The third factor, that the transfer was concealed, § 39-23.4(b)(3), also indicates fraud in this case. Although the deeds for the transfer were recorded, the nature of the transfer was concealed. While the deeds state that valuable consideration was given (U.S.' Mem. Ex. 1 at 2; Eggleston Aff. (Doc. 136) Ex. 2 at 1), no consideration was actually paid (Primavera Aff. (Doc. 135) ¶ 6; Boggs' Resp. to Interrogs. (Doc. 141 Ex. 36) at 2).[7]

---

[7] During oral arguments on June 16, 2010, Ms. Primavera argued that the statement on the deed that consideration was given for the transfer is at best ambiguous because the absence of an excise tax shown on the deed represents that consideration was in fact not given. However, N.C. Gen. Stat. § 105-228.29 (2006) exempts certain real property transactions from tax, including those for which "no consideration in property or money is due or paid by the transferee to the transferor." § 105-228.29(6). Consideration can take other forms besides money or property. <u>See, e.g.</u>, <u>IWTMM, Inc. v. Forest Hills Rest Home</u>, 156 N.C.App. 556, 562, 577 S.E.2d 175, 179 (2003) (holding that consideration "can take the shape of mutual promises to perform

The lack of consideration by itself also indicates fraud under §
39-23.4(b)(8).

The transfer also indicates fraudulent intent under the
fourth factor, which considers whether the transfer was made
after the debtor was "sued or threatened with suit." § 39-
23.4(b)(4). Mr. Boggs stated in his deposition that Corredores
was created for "asset protection" because he had been threatened
with a lawsuit and was afraid he could lose everything as a
result. (Boggs Dep. (Doc. 140 Ex. 114) at 33-37.)

The tenth factor considers whether the transfer occurred
shortly before or after a substantial debt was incurred. § 39-
23.4(b)(10). The transfers began in 2000, which was shortly
after Mr. Boggs filed his 1999 and 1998 tax returns, both of
which prompted the U.S. to assess significant tax debts upon
examination of the returns in 2002. The proximity in time
between the transfers and the tax debt is an indication of Mr.
Boggs' fraudulent intent.

All of the above factors, taken together, are sufficient to
indicate that Mr. Boggs transferred the properties with the
intent to hinder, delay, or defraud a creditor, here the U.S.,
from collecting its debt. Therefore, under § 39-23.4, Mr. Boggs'

---

some act or to forbear from taking some action"). Therefore,
this court cannot find that the absence of an excise tax on a
deed establishes that the parties intended to represent that no
valuable consideration was exchanged, particularly when the deed
recites that valuable consideration was given.

conveyances were fraudulent as to the U.S., and, as a remedy, the U.S. may avoid the transfers in order to satisfy its claim against Mr. Boggs.[8]  See N.C. Gen. Stat. § 39-23.7(a)(1) (2006). Thus, Mr. Boggs is considered to have ownership rights to the OMOA properties for the purpose of the U.S. collecting its debts.[9]  Accordingly, since Mr. Boggs retains ownership rights to the properties under North Carolina law in regard to his debts, the nominee or alter ego liens against the properties are proper under 26 U.S.C. § 6321 (2006), and those liens may be foreclosed under 26 U.S.C. § 6331 (2006).[10]

---

[8] Since the U.S. has absolved Ms. Primavera of any debt by declaring her an innocent spouse, the U.S. may only avoid the transfer as to the property interest that Mr. Boggs transferred, but not as to the interest that Ms. Primavera transferred. However, as discussed in the next section, Ms. Primavera may not claim any interest in the property because of her unclean hands, and OMOA relinquished any interest that it might have held when it consented to judgment in favor of the U.S.  See infra Part II.A.2.b.  Therefore, the U.S. may claim the entire properties.

[9] Mr. Boggs' "ownership" of the property does not extend beyond the government's right to avoid the transfer for the purpose of collecting Mr. Boggs' unpaid federal taxes.

[10] As an alternative to determining Mr. Boggs' property ownership status under § 39-23.4, this court applies the factors set forth by other federal district courts in North Carolina in United States v. Holland, 637 F.Supp.2d 315, 320 (E.D.N.C. 2009), United States v. Greer, 383 F.Supp.2d 861, 868 (W.D.N.C. 2005), aff'd in part and vacated in part, 182 Fed.Appx. 198, 2006 WL 1444889 (2006) (unpublished table opinion), and Hill v. United States, 844 F.Supp. 263, 271 (W.D.N.C. 1993) to reach the same result.  These factors are substantially similar to the factors listed in § 39-23.4.  The factors are as follows: 1) "the treatment by the taxpayer of the asset as his own;" 2) "control over the [alleged nominee] by the taxpayer or a close relationship between them;" 3) "use of the [alleged nominee's] funds to pay personal expenses of the taxpayer;" 4) "transfer of

-22-

### b. Ms. Primavera's Rights to the OMOA Properties

Ms. Primavera argues that there is a genuine issue of material fact as to whether she has a one-half undivided interest as a tenant in common with Mr. Boggs in the Faith Road property and in the Tract 1 and Tract 2 property. Ms. Primavera states that since the transfer of the property to Corredores was a "sham and a legal nullity," the title to the properties remained as though the conveyances never occurred. (Br. by Primavera (Doc. 137) at 9.) She contends that when she and Mr. Boggs divorced, the tenancy by the entirety was severed for the properties and became a tenancy in common. (Id.) Ms. Primavera was declared an innocent spouse in 2004, which she argues meant that the liens

---

the property to the [alleged nominee] for a nominal sum;" 5) "the fact that the [alleged nominee] supported the taxpayer;" 6) "whether the taxpayer expended personal funds for the property;" 7) "whether the taxpayer enjoys the benefit of the property;" and 8) "whether the record titleholder interfered with the taxpayer's use of the property." Holland, 637 F.Supp.2d at 320. All of these factors, except for the third and fifth, are present in this case. As previously discussed, Mr. Boggs treated the properties as his own after the transfers by continuing to reside at the Fink Street property and by making improvements to the Faith Road property. He had control over the trusts in his role as managing director. No consideration was given for the transfer to Corredores. Mr. Boggs used his personal funds for improvements made on the Faith Road property and was not compensated. The trusts did not interfere with or interrupt Mr. Boggs' use of the properties. Therefore, Corredores, Northstar, and OMOA are nominees or alter egos of Mr. Boggs under Holland, Greer, and Hill.

Furthermore, the analysis set forth in this opinion involves the same factors as United States v. Haddock, 144 F.Supp. 720 (E.D.N.C. 1956), even though that case relied on North Carolina's recognition of broad equitable powers rather than N.C. Gen. Stat. § 39-15, which was the fraudulent conveyance statute at the time that has since been repealed. Haddock, 144 F.Supp. at 724-25.

did not attach to her undivided one-half interest when they were filed by the IRS in 2005. (Id.)

This court declines to adopt Ms. Primavera's theory. Rather than erasing a transaction as if it never happened, Section 39-23 states only that the transfer is "fraudulent as to a creditor," § 39-23.4(a) (emphasis added), and "a creditor . . . may obtain . . . [a]voidance of the transfer," § 39-23.7(a)(1) (emphasis added). The property is deemed to be owned by the debtor in regard to the creditor's right to the property, but the statute does not imply that the transfer is void as to any parties other than the creditor.

Although Ms. Primavera claims that she is seeking a remedy under law rather than an equitable remedy (Reply to Opp'n by U.S. to Primavera's Mot. Summ. J. (Doc. 156) at 6), she provides no viable theory of law for her assertion that the transfers of the properties to Corredores were a legal nullity as to her interests in the property. Therefore, this court construes her pleadings as seeking an equitable remedy.

"Equity is for the protection of innocent persons and is a tool used by the court to intervene where injustice would otherwise result." Swan Quarter Farms, Inc. v. Spencer, 133 N.C.App. 106, 110, 514 S.E.2d 735, 738 (1999). One who comes to the court with unclean hands is barred from equitable relief. See id. Ms. Primavera argues that she is an innocent party because the IRS granted her "innocent spouse" status as to Mr.

-24-

Boggs' tax liability. (Reply to Opp'n by U.S. at 6-7.) However, just because Ms. Primavera was declared an innocent spouse as to the tax liability does not mean that she is also an innocent spouse as to the transfers of property to Corredores. Ms. Primavera signed the deeds, which stated that the properties were transferred from her and Mr. Boggs to Corredores for "valuable consideration." (U.S.' Mem. Support Mot. Summ. J. (Doc. 141) Ex. 1 at 2; Eggleston Aff. (Doc. 136) Ex. 2 at 1.) In fact, no consideration was given. (Primavera Aff. (Doc. 135) ¶ 6; Boggs' Resp. to Interrogs. (Doc. 141 Ex. 36) at 2.) Despite Ms. Primavera's contention that she was "skeptical" of the process and "never fully understood the purposes to be served by the Pure Trust Organizations" (Primavera Aff. ¶ 5), she willingly signed the deed knowing that no consideration was actually given.[11] She cannot now receive relief in equity from a fraud in which she participated, and, because of her unclean hands, the transfers of

---

[11] Ms. Primavera stated in her deposition that she signed the deed without reviewing it. (Primavera Dep. (Doc. 148) at 137.) However, if "a person of mature years of sound mind who can read or write signs or accepts a deed or formal contract affecting his pecuniary interest, it is his duty to read it, and knowledge of the contents will be imputed to him in case he has negligently failed to do so." Elam v. Smithdeal Realty & Ins. Co., 182 N.C. 599, 109 S.E. 632, 634 (1921). This general rule is excepted if something has been said or done to mislead the person signing or "to put a man of reasonable business prudence off his guard in the matter." Id. Ms. Primavera has not alleged that she was mislead or put off her guard in relation to the matter of consideration recited on the deed. Therefore, she is presumed to have knowledge that the deed recited that consideration was given for the transfer.

property are not void as to her interests.  See Penland v. Wells, 201 N.C. 173, 159 S.E. 423, 424 (1931) ("'Where both parties have united in a transaction to defraud another, or others, or the public, or the due administration of the law . . . the Courts will not enforce it in favor of either party.'  The entire doctrine is based upon the 'clean hands' concept of equity."); Sellers v. Ochs, 180 N.C.App. 332, 336, 638 S.E.2d 1, 4 (2006) (barring a plaintiff from enforcing a resulting or constructive trust when she had unclean hands because she purchased the property in the defendant's name in order to avoid creditors). As a result, Ms. Primavera has no claim to the OMOA properties.

Ms. Primavera may not independently claim a right to an undivided one-half of the properties; furthermore, any interest OMOA might have retained was relinquished when OMOA consented to judgment in favor of the U.S.  (Joint Mot. Entry Consent J. (Doc. 129).)  Thus, the U.S. is entitled to claim complete ownership of the OMOA properties and to receive recovery of complete ownership.

Accordingly, because there are no genuine questions of material fact as to the status of Corredores, Northstar, and OMOA as nominees of Mr. Boggs and as to Ms. Primavera's rights to the properties, this court will grant the government's motion for summary judgment as to the OMOA properties.

### 3. Wood Duck Cove Property

The U.S. argues that the court should grant summary judgment

on the foreclosure of the federal tax lien against the Wood Duck
Cove property because the lien attached before Corredores
transferred the property to Ms. Primavera, and, therefore, the
lien followed the property through the transfer. (U.S.' Mem.
Support Mot. Summ. J. (Doc. 141) at 12-14.) The U.S. does not
dispute that the lien only applies to an undivided one-half
interest in the property. (U.S.' Reply Primavera's Opp'n U.S.'
Mot. Summ. J. (Doc. 151) at 7-10.) Ms. Primavera, however,
argues that the evidence creates a genuine issue of material fact
as to whether she is the sole owner of the property, and she
presents various legal theories that she claims demonstrate that
the property has always been her sole property. (Opp'n Mot.
Summ. J. by U.S. (Doc. 145) at 12-13.) According to Ms.
Primavera's theory, if the property was her sole property, then
Mr. Boggs never had an interest to which the U.S. could attach a
lien.

First, she argues that because she purchased the Wood Duck
Cove property with her separate property, she is the sole owner
of the property under the principles of resulting trust law in
North Carolina. (Primavera's Br. Opp'n Mot. Summ. J. by U.S.
(Doc. 147) at 12-13.) "A resulting trust arises when a person
becomes invested with the title to real property under
circumstances which in equity obligate him to hold the title and
to exercise his ownership for the benefit of another." <u>Mims v.
Mims</u>, 305 N.C. 41, 46, 286 S.E.2d 779, 783 (1982). However, if

property is titled in the name of a husband and wife together as tenants by the entirety, the law presumes that the spouse who paid for the property "intended to make a gift of the entirety interest to the other spouse." Dillingham v. Dillingham, ___ N.C.App. ___, ___, 688 S.E.2d 499, 504 (2010). To establish that the transaction created a resulting trust instead of a gift, the spouse asserting the claim must rebut the presumption of a gift by "clear, cogent, and convincing evidence." Id. This may be shown by reference to all the surrounding facts and circumstances of the transaction. Id. Declarations of intent are limited to those made at the time of the transaction. Mims, 305 N.C. at 58, 286 S.E.2d at 790. Therefore, any statements that Ms. Primavera makes now about her intent at the time of the purchase are irrelevant. Other than her current arguments that the transaction created a resulting trust, she has not presented any evidence to rebut the presumption of a gift. Therefore, the transaction created a tenancy by the entirety between Ms. Primavera and Mr. Boggs, not a resulting trust.

Next, Ms. Primavera argues that the Wood Duck Cove Property retained its character as separate property under North Carolina law because she purchased the property with proceeds of her separate property. (Primavera's Br. Opp'n Mot. Summ. J. by U.S. (Doc. 147) at 13.) To support this contention, she cites to Pawlus v. Wise-Pawlus, 195 N.C.App. 325, 672 S.E.2d 782 (2009) (unpublished table opinion). That case concerns North Carolina's

equitable distribution statute, which is not at issue here.  The
fact that Ms. Primavera used proceeds of her separate property to
purchase Wood Duck Cove does not alter the presumption under
North Carolina law that the property was deeded as a tenancy by
the entirety to Mr. Boggs and Ms. Primavera.

Ms. Primavera also argues that the evidence before the court
shows that the transfer to Corredores was a mistake, and that
Corredores' failure to remedy the mistake before 2006 should not
alter the fact that the transfer was a mistake.  (Primavera's Br.
Opp'n Mot. Summ. J. by U.S. (Doc. 147) at 13.)  Ms. Primavera
stated in her deposition that she signed the deed without
reviewing it and did not realize until later that the Wood Duck
Cove property was also listed in the deed.  (Primavera Dep. (Doc.
148) at 137-38.)  She also stated that she thought the deed was
only for the Fink Street property but that the lawyer had
"tricked" her by placing all of the properties in one deed.  (Id.
at 136.)  It appears that Ms. Primavera obtained the services of
the lawyer through her practice as a real estate agent and that
she had trusted his services because she had used him in the
past.  (Id. at 137-38.)  Mr. Boggs stated in his deposition that
the inclusion of the Wood Duck Cove property was "by mistake" and
that he tried to remedy the mistake by writing letters.  (Boggs
Dep. (Doc. 147 Ex. 1) at 93, 96-97.)  Neither Ms. Primavera nor
Mr. Boggs stated that Corredores tried to mislead or deceive them
in the transfer.  If a literate person of sound mind fails to

read a deed or contract, that person cannot subsequently avoid the consequences of signing the document unless she has been mislead or deceived by the other party. See Taylor v. Edmunds, 176 N.C. 325, 97 S.E. 42, 43 (1918); Elam v. Smithdeal Realty & Ins. Co., 182 N.C. 599, 109 S.E. 632, 634 (1921). In the present case, Ms. Primavera has not argued that Corredores deceived or mislead her, but rather that a mistake was made, seemingly by an attorney that she procured herself.[12] Therefore, she cannot avoid the consequences of signing the deed merely because she failed to read it. See id. Even if she were able to show that she was mislead or deceived by Corredores, she could not avoid the transfer because of her unclean hands. See supra Part II.A.2.b. Thus, she relinquished her right to the property in 2000, and it is necessary to determine what right, if any, she gained when Corredores recorded the deed transferring title back to her in 2006.

Before the transfer to Corredores in October of 2000, Ms. Primavera and Mr. Boggs owned the property as tenants by the entirety. When Mr. Primavera and Mr. Boggs initiated the

---

[12] Ms. Primavera has not made out a legally sufficient case for reformation of the deed by mutual mistake. In such an action, "the plaintiff has the burden of showing that the terms of the instrument do not represent the original understanding of the parties and must do so by clear, cogent and convincing evidence." Hice v. Hi-Mil, Inc., 301 N.C. 647, 651, 273 S.E.2d 268, 270 (1981). Ms. Primavera has not presented any evidence indicating that Corredores believes that the deed mistakenly included the Wood Duck Cove property.

transfer to Corredores, that act converted their ownership in the property from a tenancy by the entirety to a tenancy in common. See North Carolina State Highway Commission v. Myers, 270 N.C. 258, 261-62, 154 S.E.2d 87, 89 (1967) ("An estate by the entirety can be destroyed or dissolved by the voluntary joint acts of the husband and wife."). Mr. Boggs' transfer of his undivided one-half of the property to Corredores can be avoided by the U.S. for the purpose of collecting the debts Mr. Boggs owes.[13] See supra Part II.A.2.a; N.C. Gen. Stat. § 39-23.7(a)(1). Thus, after the transfer in 2000, although the deed purported to transfer the entire property (Eggleston Aff. (Doc. 136) Ex. 4), Corredores actually only received a one-half undivided interest from Ms. Primavera. The U.S. obtained a one-half interest by avoiding Mr. Boggs' attempt to transfer his undivided one-half to Corredores.

The government's one-half undivided interest became valid as to third parties when the U.S. recorded its lien on November 18, 2005. See In Re Avis, 178 F.3d 718, 721 (4th Cir. 1999) (citing 26 U.S.C. § 6323(a), (f)) (holding that a lien becomes valid as

---

[13] The U.S. obtained a lien as to Mr. Boggs' interest in the property by the determination of the assessment in 2002. See 26 U.S.C. § 6322 (2006) (stating that a taxpayer lien aries at the time the assessment is made and continues until the liability is satisfied); United States v. Bond, 279 F.2d 837, 841 (4th Cir. 1960) (holding that no recording is necessary for a lien to be valid against the taxpayer). Although that lien was placed on the property after the transfer to Corredores in 2000, the U.S. may apply the law of fraudulent conveyances to avoid the transfer. Even assuming Corredores had some right to challenge the government's lien, Corredores has waived any interest it may have had in the property by stipulation. (Doc. 90.)

to a third party when the IRS files notice of the lien in a
recording office of the state in which the property is located).
Even though Ms. Primavera received the deed to the Wood Duck Cove
property in May of 2005 (Eggleston Aff. Ex. 10 at 1), because it
was not recorded until June 6, 2006 (id.), she took subject to
the government's recorded lien.  See § 47-18 (No "conveyance of
land . . . shall be valid to pass any property interest as
against lien creditors . . . but from the time of registration
thereof in the county where the land lies.").  Therefore, the
U.S. has an undivided one-half interest in the Wood Duck Cove
property, and this court will grant the United States' motion for
summary judgment in that regard.

B. **Ms. Primavera's Motion for Summary Judgment**

On April 19, 2010, Ms. Primavera moved for summary judgment,
seeking a judgment declaring that she has a one-half undivided
interest in the Tract 1 and Tract 2 property and the Faith Street
property and full interest in the Wood Duck Cove property.  In
accordance with the above discussion, this court finds that Ms.
Primavera has no interest in the Faith Street property or the
Tract 1 and Tract 2 property and a one-half undivided interest in
the Wood Duck Cove property.  Therefore, her motion for summary
judgment is denied.

C. **Joint Motion for Entry of Consent Judgment**

On April 8, 2010, OMOA and the U.S. entered a joint motion
for a consent judgment in which OMOA agreed to dismiss its

-32-

complaint against the U.S. and consent to the U.S.' counterclaim
to foreclose on the federal tax liens against the four
properties. (Joint Mot. Entry Consent J. (Doc. 129).) Ms.
Primavera objected to the court filing a decree regarding the
sale of the land and distribution of proceeds before her claims
regarding the property have been resolved. (Primavera's Object.
in Part to Joint Mot. Entry Consent J. (Doc. 149) at 4-5.) Since
the above discussion resolves Ms. Primavera's property interests,
her objection is no longer relevant.

Mr. Boggs objected to the motion for consent judgment on the
grounds that OMOA and the U.S. have failed to meet their burden
of demonstrating that Rule 54(b) certification is warranted in
this case, and that even if the motion was properly made,
certification should not be granted because the counterclaims as
to OMOA and the third-party claims as to Mr. Boggs are
"completely intertwined." (Boggs' Resp. U.S.' Joint Mot. Entry
Consent J. (Doc. 150) at 7.) Rule 54(b) of the Federal Rules of
Civil Procedure permits a district court to enter final judgment
as to one or more but fewer than all the claims in a multi-claim
action. Since the above discussion resolves all of the pending
claims in this action, Rule 54(b) certification is no longer
relevant. Therefore, this court grants the U.S.' and OMOA's
joint motion for consent judgment.

### D. OMOA's Motion to Dismiss Ms. Primavera's Counterclaim

On April 19, 2010, OMOA moved to dismiss Ms. Primavera's counterclaim against it for failure to state a claim upon which relief may be granted. (OMOA's Mot. Dismiss (Doc. 139).) Because the above discussion fully resolves the rights of the parties by denying Ms. Primavera's motion for summary judgment, granting the government's motion for summary judgment, and granting OMOA's and the government's joint motion for consent judgment, this motion is no longer relevant. Therefore, the court dismisses it as moot.

## III. Conclusion

It is therefore **ORDERED** that the United States' Motion for Summary Judgment (Doc. 140) is **GRANTED**, and it is **FURTHER ORDERED** that Ms. Primavera's Motion for Summary Judgment (Doc. 134) is **DENIED**. It is **FURTHER ORDERED** that the Joint Motion for Entry of Consent Judgment by the U.S. and OMOA (Doc. 129) is **GRANTED**. Finally, it is **FURTHER ORDERED** that OMOA's Motion to Dismiss Counterclaim (Doc. 139) is **DISMISSED AS MOOT**. The United States is directed to submit a judgment prepared in accordance with the terms of this order and including legal descriptions of the relevant property within ten (10) days of the entry of this order. A copy of the United States' proposed judgment shall be provided to all counsel prior to submission to this court.

This the 11th day of August, 2010.

William L. Osteen, Sr.
United States District Judge